IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| JAY H. RHODES, | ) | |
| | ) | No. 32509-1-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RODNEY MACHUGH, | ) | PUBLISHED OPINION |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, C.J. — Comments to § 23 of the *Restatement (Third) of Torts*, which deals with strict liability imposed on the owners of abnormally dangerous animals, observe that the common law has been satisfied overall with the generalization that livestock are not excessively dangerous, but "[i]n the future, courts might wish to give consideration to *particular genders* . . . of a species that involve danger levels uncommon for the species itself." RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 23 cmt. e (2010) (emphasis added). In this case, Jay Rhodes asks us to hold the owner of a ram (a male sheep) strictly liable for harm caused by the ram on

account of the ram's gender-based dangerousness, rather than any abnormal dangerousness of which the owner was aware.

Mr. Rhodes is a particularly sympathetic plaintiff and appellant, both in the circumstances he presents and the forthrightness of his argument on appeal. But we conclude that existing Washington common law strikes the appropriate balance in imposing limited strict liability on the owners of domestic animals and otherwise imposing a duty of care commensurate with the character of their animals. We affirm the summary judgment dismissal of Mr. Rhodes's complaint.

## FACTS AND PROCEDURAL BACKGROUND

Jay Rhodes and Rodney MacHugh are long-time friends and neighbors. Both men live in Richland and have farmed for decades. Mr. Rhodes has raised cows, horses, and occasionally pigs and goats, but he described the summer of 2012 as "my first excursion with sheep. And an unfortunate one." Clerk's Papers (CP) at 21. Mr. MacHugh has bred sheep for over thirty years. Because Mr. MacHugh's land is prone to flooding, Mr. Rhodes has allowed Mr. MacHugh to keep some of his livestock on Mr. Rhodes's property.

In the summer of 2012, Mr. MacHugh and Mr. Rhodes went to a livestock yard in Lewiston, Idaho, where Mr. MacHugh purchased a ram to replace his existing ram, which he described as "in really old shape." CP at 26. The replacement ram was eight or nine

2

months old[1] and weighed in the neighborhood of 150 pounds. It showed no vicious tendencies. The men took it directly to Mr. Rhodes's property where, for the following month, it caused no problems. In the weeks before Mr. MacHugh put the ram in with ewes, Mr. Rhodes described it as "real friendly. He'd come up to me several times when I was changing water, and I'd pet him." CP at 22.

On August 20, 2012, Mr. Rhodes went into his yard to turn on his sprinklers. By that time, Mr. MacHugh had put several ewes in the pasture with the ram. Mr. Rhodes walked past them and toward the five-foot sprinklers in the pasture. Just as he touched the valve at the top of the sprinklers, the ram butted him from behind, knocking him to the ground. According to Mr. Rhodes, the ram continued to "jump up in the air and then he'd hit me with his head," knocking him out "a couple of times," for as much as 30 minutes. CP at 23. Fortunately, a neighbor who stopped by to bring Mr. Rhodes some cantaloupes saw what was going on. Although Mr. Rhodes told her not to come into the pasture, she began throwing her cantaloupes at the ram, which was sufficiently distracted that Mr. Rhodes was able to crawl to the gate. She helped him out and slammed the gate on the charging ram. Mr. Rhodes, then 82 years old, suffered a concussion, five broken ribs, and a broken sternum and shoulder. He was hospitalized for 16 days.

---

[1] At that age, it was a "lamb ram," but we refer to it as a ram for simplicity.

3

Mr. Rhodes filed this action in an effort to recover for his injuries. He did not contend that the ram was abnormally dangerous and he refused to accuse his friend of negligence, testifying, "I don't think Mr. MacHugh thought there was anything wrong" with the ram. CP at 23. For his part, Mr. MacHugh admitted that he had owned as many as three "mean" rams over the years but that "on my place, if they're the least bit mean, they go real quick." CP at 27. He testified that he had selected this ram because it was the "friendliest" of three that the seller had raised on a bottle after their mother died. CP at 26.

Because Mr. Rhodes relied exclusively on a theory of strict liability that he asked the court to extend to the owners of all rams, not just those known to be abnormally dangerous, the parties presented the legal issue to the trial court on summary judgment. Mr. MacHugh's motion for summary judgment dismissing the claim was granted. Mr. Rhodes appeals.

## ANALYSIS

The sole issue on appeal is whether summary judgment in favor of Mr. MacHugh was proper because he is not strictly liable for harm caused by a ram he did not know to be abnormally dangerous. No material facts are in dispute and we, like the trial court, are presented with a pure question of law that we review de novo. *Triplett v. Dep't of Soc. & Health Servs.*, 166 Wn. App. 423, 427, 268 P.3d 1027 (2012).

4

No. 32509-1-III
*Rhodes v. MacHugh*

For more than a century, the rule in Washington regarding liability for harm caused by a domestic animal[2] has been:

> "The owner or keeper of a domestic animal not naturally inclined to commit mischief, while bound to exercise ordinary care to prevent injury being done by it to another, is not liable for such injury if the animal be rightfully in the place when the mischief is done, unless it is affirmatively shown, not only that the animal was vicious, but that the owner or keeper had knowledge of the fact. When such scienter exists, the owner or keeper is accountable for all the injury such animal may do, without proof of any negligence or fault in the keeping, and regardless of his endeavors to so keep the animal as to prevent the mischief."

*Lynch v. Kineth*, 36 Wash. 368, 370-71, 78 P. 923 (1904) (emphasis omitted) (quoting 2 Cyc. *Animals* 368); and more recently *Johnston v. Ohls*, 76 Wn.2d 398, 400, 457 P.2d 194 (1969); *Sligar v. Odell*, 156 Wn. App. 720, 732, 233 P.3d 914 (2010); *see also* 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 3.6, at 133 (4th ed. 2013) (noting that "[s]trict liability for injuries caused by individual animals known to be abnormally dangerous is still the general rule," but "when the animal is not an abnormally dangerous specimen of its class, negligence in controlling the animal must be proven").

---

[2] A "domestic animal," as defined by the *Restatement (Second) of Torts*, is one "that is by custom devoted to the service of mankind at the time and in the place in which it is kept." RESTATEMENT (SECOND) OF TORTS § 506(2), at 10 (1977). "[T]he test is whether the animals are as a class recognized by custom as devoted to the service of mankind." *Id.* § 506 cmt. a.

5

Washington cases are consistent with the *Restatement (Second) of Torts* (1977). In *Arnold v. Laird*, 94 Wn.2d 867, 871, 621 P.2d 138 (1980), our Supreme Court noted that the *Restatement (Second)* "recognizes two separate causes of action" against the owner of a domestic animal that causes injury. Under section 509, strict liability applies where the animal "has known dangerous propensities abnormal to its class." *Arnold*, 94 Wn.2d at 871. Section 518, on the other hand, "provides that if there are no known abnormally dangerous propensities, the owner is liable only if he is negligent in failing to prevent the harm. The amount of care required is commensurate with the character of the animal." *Id.* (emphasis omitted) (citing § 518 cmt. f).

Mr. Rhodes concedes that rams have not historically been regarded as being inherently dangerous animals. Br. of Appellant at 1-2; RESTATEMENT (SECOND) § 509 cmt. e ("[T]he law has not regarded bulls, stallions and rams as being abnormally dangerous animals to be kept under the strict liability stated in this Section."). Nevertheless, relying on a comment to § 23 of the most recent *Restatement of Torts*, he asks that we recognize that "[t]he dangerous propensities of rams are well-known and strict liability should attach, and this whether the animal is 'domestic' or otherwise." Br. of Appellant at 3.

The language of § 23 of the *Restatement (Third) of Torts* is similar to that of *Restatement (Second)* § 509,[3] yet the comments to § 23 propose a possible gender- or breed-based modification of the general rule treating domestic animals as not excessively dangerous. Comment *e* states, in part:

> Overall, the common law has been satisfied with the generalization that livestock and dogs are not excessively dangerous and has applied this generalization to all livestock and dogs. *In the future, courts might wish to give consideration to particular genders or breeds of a species that involve danger levels uncommon for the species itself. If so, it might be appropriate to impose strict liability, without individualized scienter, on the owner of such an animal.*

RESTATEMENT (THIRD) § 23 cmt. e (2010) (emphasis added). Mr. Rhodes asks us to act on this acknowledgment and common knowledge that while ewes may be timid, rams are known to be dangerous.

Prior versions of the *Restatement* have not overlooked the different temperament of male domestic animals, pointing out that "[b]ulls are more dangerous than cows and steers; stallions are more dangerous than mares and geldings; rams are more dangerous than ewes and lambs." RESTATEMENT (SECOND) § 509 cmt. e. But historically the framework of liability for negligence has been viewed as adequate to address gender

---

[3] "An owner or possessor of an animal that the owner or possessor knows or has reason to know has dangerous tendencies abnormal for the animal's category is subject to strict liability for physical harm caused by the animal if the harm ensues from that dangerous tendency." RESTATEMENT (THIRD) § 23, at 303 (2010).

differences, and refusing to broaden strict liability has also been justified by policy reasons.

The *Restatement (Second)* recognizes the relatively dangerous propensities of male domestic animals such as bulls, stallions, and rams but characterizes them as normal to their class. As the comments to § 509 observe, "these animals have been kept for stud purposes from time immemorial so that the particular danger involved in their dangerous tendencies has become a normal incident of civilized life." RESTATEMENT (SECOND) § 509 cmt. e; *see also id.* § 509 cmt. d. (noting that such animals "do not introduce any unusual danger, since the somewhat dangerous characteristics of these animals are a customary incident of farming"). In other words, a ram has not been considered "abnormally" dangerous for purposes of applying strict liability under § 509 because its dangerous propensities are "normal" for its species.

It is also for policy reasons that owners of male domestic animals have not been held to a standard of strict liability, because often it is the very characteristics that cause the males to be dangerous that make them useful to society. The comments to § 518 of the *Restatement (Second)* observe that "[t]he high temper normal to stud animals is so inseparable from their usefulness for breeding purposes that they are not kept at the risk of the liability stated in § 509." RESTATEMENT (SECOND) § 518 cmt. f. The comments explaining the rationale for § 509's rule of strict liability similarly observe that

8

the virility which makes [bulls, stallions, and rams] dangerous is necessary for their usefulness in performing their function in the socially essential breeding of livestock, justifies the risk involved in their keeping. Therefore, the law has not regarded bulls, stallions and rams as being abnormally dangerous animals to be kept under the strict liability stated in this Section.

*Id.* § 509 cmt. e; *see also id.* § 509 cmt. d ("[T]he slightly added risk due to their dangerous character is counterbalanced by the desirability of raising livestock.").

The law is not oblivious to the greater risk posed by male livestock used for breeding in the context of liability for negligence, and greater precautions are typically required in light of their characteristics. RESTATEMENT (SECOND) § 509 cmt. e. "The amount of care required is commensurate with the character of the animal." *Arnold*, 94 Wn.2d at 871. As the comments to § 518 explain, "the keeper of a bull or stallion is required to take greater precautions to confine it to the land on which it is kept and to keep it under effective control when it is taken from the land than would be required of the keeper of a cow or gelding." RESTATEMENT (SECOND) § 518 cmt. g.

"Rules of law . . . should not be changed for light or transient causes; but, when time and events prove the need for a change, changed they must be." *State ex rel. Wash. State Fin. Comm. v. Martin*, 62 Wn.2d 645, 666, 384 P.2d 833 (1963). Here, the utility of domestic animals remains undiminished. Those who raise them and face the greatest exposure to relatively more dangerous genders or breeds will be familiar with their characteristics. Third parties continue to have recourse for an owner's negligence, and

9

owners are required to take greater precautions to confine and control animals in light of their characteristics. Mr. Rhodes's unfortunate excursion with Mr. MacHugh's ram does not persuade us that the limited scope of strict liability that Washington has historically imposed on the owners of domestic animals should be enlarged.[4]

Affirmed.

_____
Siddoway, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Fearing, J.

---

[4] The legislature can, of course, act. We note that by statute, and in derogation of the common law, it has imposed strict liability on the owner of a dog that bites a person, as long as the victim was in a public place or lawfully in or on a private place. RCW 16.08.040; *Sligar v. Odell*, 156 Wn. App. at 727; *Beeler v. Hickman*, 50 Wn. App. 746, 751-52, 750 P.2d 1282 (1988).